Good morning. I would like to reserve five minutes for rebuttal. My name is Scott Crowell. It's been an honor and privilege to represent the Rincon Band for the last 15 years. With me in the court today are Bo Mazzetti, Gil Perrada, Charlie Kolb, and Stephanie Spencer, all members of the Tribal Council. Last weekend, the Chancellor took our Tribal Chairman from us. It's his perseverance and vigilance in holding the State accountable that required the State to honor its agreements with the Rincon Band, the issues at stake here today that are part of his legacy. I have quite a prepared statement, but I want to go straight to this suggestion that there are a multitude of interpretations that the Tribes are taking on the number of machines. The three Tribes that have filed suits, San Pasqual, Calusa, and Rincon, all agree that zero is a smaller number than 350. The differences in the calculation that he tries to make significance of are real minor ones based on assumptions in the calculations. Are there 104 Tribes in the State or 105? Because since 1999, the federal government has recognized an additional Tribe. Or you have to make assumptions on how many Tribes that have grandfathered devices that were operating somewhere between zero machines in 1999 and 350 machines in 1999, just how many they were operating. Those factual distinctions that can be proven if a court can get to the merits of the issue are what separates Calusa and Rincon and San Pasqual's numbers. It's not that there's this myriad of positions out there. Each one of these Tribes is fully capable of representing the interest of those Tribes that believe there are more machines available in the pool. Is it the case that if you were to prevail and get a declaratory judgment on the size of the pool, that at least some Tribes would get less licenses? No. Fewer licenses? No. Mr. Kaufman, in his arguments, suggested that maybe the court would come with a lower number. The State advocates that all the licenses that have been out there have been issued. They're not advocating a lower number. I know of no party that advocates a lower number. I know of no merit to suggesting that there's a lower number. The way I had understood it, everybody wanted more than they had, or at least some people wanted more than they had. They want more licenses so they can have more machines. What I want to know is, whatever the number is, lower, higher, whatever, it sounds as though it comes up short of giving some Tribes as many gambling machines as they want to have. And I'm wondering, if you prevail, do some Tribes get fewer machines? Nobody would get fewer machines than they currently have. And RINCON's litigation does not involve its position in the tier or last in line. Our position is that there are enough licenses out there that if the State were to heed the court's advice of what the correct number of licenses is, that it would issue another draw. And in those draw, based on the priorities of the tiers that the Tribes are in there, that there would be an adequate number for RINCON to be able to get its 400. And frankly, the real-world reality is- If we say the State's got it right now, the number is right, no reason for us to substitute a lower or higher number, but RINCON is entitled to 400 more machines, then other Tribes have to get fewer machines. No, no, because our position, that RINCON is entitled to 400 more machines, is that there are more devices available in the pool. We're not arguing you should give us 400 and take away 400 from someone else. We're arguing that the number is far larger than what the State suggested it is, that it should convene another draw based on what the right number is, and that RINCON, in its appropriate priority and line, would get 400 out of that future draw. Could the case come out that you get 400 more slot machines, but the number in the pool is not increased? Not for us. Our argument to entitlement to 400 machines is based on the position that there are more devices available in the pool. The questions that were raised here in the earlier argument are quite correct, and I believe that Mr. Foreman was good to point out that what this Court said, and Wilson decaps on, because I really think that that's the fundamental issue here, is if you affirm the District Court opinion here, what you're doing is allowing the State to unilaterally determine what the number is. So it's not protecting the interest of the Tribes. It's protecting the interest of the State to act with impunity regarding the interpretation of provisions in this compact. That may be the practical effect. Of course, I suppose when you dismiss a case because an indispensable party is immune, that usually leaves somebody with an advantage. In other words, you may have to get to the immunity issue first, and if the indispensable party is immune, that leaves the party wherever the situation finds them, I guess. Judge, in the American Greyhound case, you correctly pointed out that even when a party is found necessary and that party is immune, the Court still goes on to the analysis of whether that party is indispensable. In contrast to American Greyhound, where the absent Tribes would have had to have relied upon the State to argue a myriad of issues that go to the very basics of that Arizona compact, both the scope of gaming, the manner in which the regulatory structure would be done, the ability to renew that compact or issue a notice of non-renewal were all at stake there, and the State was unable to adequately represent the interest of the absent Tribes. Here, we're talking about the interpretation of three or four sentences in the compact. The issue is, is the Rincon Band capable of advocating the interest of those Tribes that believe that the number of devices available in the pool is larger, and is the State able to represent the position of those Tribes that believe the number of devices available in the pool is smaller? And when you look, when you get past the analysis that they're necessary and immune, then you have to look at, are the parties capable of representing the interest that are there? And we believe that the answer is yes. And even there, where the Court made even further error by not looking at that, was the ability to fashion the relief in a way that minimized the impact, or the ability for us to go out and seek the voluntary jointer. Now, the State makes a big point that, well, at least he's got five amici Tribes that say they won't join. Well, those five amici Tribes said that they wouldn't join in litigation where we were seeking contractual impairment claims that sought to invalidate those compacts. We're not seeking. We've abandoned those claims. The analysis that he used to say Rule 19 requires dismissal of those claims don't resonate in the analysis of whether the Court should use Rule 19 to dismiss the Tribes' claim to seek a determination of the number of devices available in the pool. And even if you don't get all of the Tribes that signed the 1999 compact to voluntarily join, the more that you get to join and the greater it is that they're going to be able to represent the different interests that are out there, and in terms of the balance of the equities and whether there's equity and good conscience in allowing the case to go forward, it becomes a different equation. And we never got the opportunity to do that. So even the fact that the non-present Tribes are immune from suit doesn't excuse this Court from going through the analysis of indispensability, and that's where I believe the trial Court here made serious error. I hope that answered your question. Another point I want to make out here... It seems to me there'd be such a diversity of interests. Some Tribes might have an interest that has little equitable appeal, so they will prefer not to be part of the litigation, because if they're part of it, the weakness of their equitable case will be exposed. Since they are sovereigns and are immune from suit, why can't they just throw a monkey wrench in the proceeding by saying, We assert our sovereign immunity. We will not consent to be sued. We will not join. We will not file an amicus brief. Well, you have to look at what their interests are that are at stake and whether they're in the lawsuit or not. And I don't believe that there's a myriad of issues. Either there's Tribes that believe that the number is greater, there's Tribes that believe that the number is the same, and there are Tribes that don't care. Well, there are going to be some Tribes, we can't get financing to expand the casino this year, so we want the number held down right now so somebody else won't get ahead of us. But we can get money to expand the casino in two or three years, and then we'll want to get the number increased so that we can expand the casino and put more slot machines in. And then another Tribe says, We've already contracted for a big expansion, and our big gamble is we can get more machines this year. I mean, it can be very complicated individual business interests. Well, but those individual interests that you talked about are, you know, it's the Checker Cat Company that doesn't like the fact that Yellow Cat just got 100 more cats. In terms of what legally protectable interests they have, in the courts looking at the equity and good conscience of the court, you have to look at what interests are at stake here. And the five amici Tribes in this litigation are the Yellow Cat, simply saying, We prefer the economic advantage of no other Tribes being able to get additional machines, additional machines that the Compact legally entitles those Tribes to have and possess and put on their floor. Another point that didn't come out in the earlier argument is, under the 1999 Compact, the only guaranteed source of revenue to the Revenue Sharing Trust Fund, those Tribes that we call non-gaming Tribes or have small or no gaming operation, the only guaranteed source is from the device licensing fees. So the higher the number of devices available, the more money that's guaranteed into that fund to go to those Tribes. So we can't imagine how those Tribes would object to an interpretation that would provide them to a greater entitlement of guaranteed sourcing to the Revenue Sharing Trust Fund as opposed to this past history to where every year they've got to go back to the legislature and ask for the legislature to designate part of the Special Distribution Fund to make up for any shortfall to the Revenue Sharing Trust Fund. A significant point in looking at the analysis, and I think Judge Bybee pointed on this, is everybody didn't sign the same Compact or one Compact, but everybody signed a Compact that is very much the same. Part of the value to the Tribes in negotiating those agreements was a provision that we were going to resolve disputes in a certain way, that if you had a disagreement over the interpretation of the Compact, that you'd go through the dispute resolution process of meet and confer, try to get binding arbitration of both parties' consent if the State didn't consent, and then go to federal court. That's what RINCON negotiated in its Compact with the State, and so did everyone else. So those Tribes that are the impacted interests that are absent in this litigation were very aware when they signed those Compacts that this was the manner in which disputes over interpretation of that Compact were going to be resolved. How do you deal with, I think it came up in a previous argument maybe, but yes, they're all separate Compacts, but there's one figure, and that's the total number of licenses, that makes them interdependent. In other words, their argument is it's pretty hard to have licenses in each Compact subject to a maximum of all Compacts without somehow affecting all the other Compacts when you decide one case. I think your question to Mr. Kaufman hit the point. In terms of looking at what the interests are, it's having a court decide that issue in an objective forum versus the State unilaterally deciding that. We believe that the court should also, and the district court erred in not looking at the inequity that results of that State's unilateral interpretation because they've used this contrived interpretation to create this artificial shortage to try to force Tribes to say, if you want to expand even under your entitlement under the existing Compact, you have to come back and negotiate an amendment to the State that pays these ridiculous fees to the State that go far beyond the kind of meaningful value that Judge Canby used to set forth in the Shoshone-Bannock decision. So I think the inequitable behavior of the State underscores the fact that you can't allow for a situation to where the State's allowed to interpret the Compact with impunity. As a practical matter, how do you think it would fall? Let's say that you prevailed and a district court looked at the things and said, at least for the purposes of this Compact, the total number of licenses is 50,000. Then what happens with the other Compacts? Two aspects. Number one, I expect that whoever loses that litigation will go back to remand to the district court, have the argument on the merits. I suspect that whichever party loses is going to be right back before the next court. Okay, let's say then that gets affirmed. And at that point, you get rid of duplicity. You've got one number because it would be back here. But the second effect would be for the State to take that number and say the court has told us this number, we're going forward with a future draw. The State talks about the concern of what happens if another court comes up with another number. But I don't believe that's a realistic situation of the duplicitous concerns to the State. There's no way for this to be resolved any place other than federal court, is there? They can't get into State court on the question of the number. No. The State couldn't run into State court, for example, and ask for declaratory judgment on that question because you have your rights under the Compact to come into federal court. Correct, correct. And the dispute resolution provisions do provide for binding arbitration. So really the only danger of ending up with two different numbers is to have parallel proceedings before two different district courts, which could be resolved by this court. Could be resolved by this court or if they're both pending at the same time. For example, if you remand both Calusa and Rincon back in terms of either transferring or consolidation at the district court level. But that's correct. Ultimately you're going to have one decision probably resolved by this court. Are all of these compacts identical? The 1999 compacts have identical terms. How many 1999 compacts are there? I believe there's 62. Okay. And since then, how many do we have? You have a handful of new compacts. At the end of Governor Davis' term, there was a small handful of tribes that signed compacts with slightly different terms. And then there were the Schwarzenegger compacts. I believe there's now ten of them that have substantially different terms, including blowing the doors off any suggestion that there's a statewide limit to the number of gaming devices that are used on Indian land. Of the Schwarzenegger, how many Gray-Davis contracts are there? My best recollection is that there's about 66 or 67, 63 or 64 of which are essentially identical. Okay. And then of the Schwarzenegger compacts, you say that we've got ten and that there are terms in there that are significantly different. Correct. Are they all unlimited numbers? No, but they're all very large numbers. Well, with the exception of Yurok, which is 100, but they're a very remote location in the northwestern corner of the state. But the first five were for unlimited numbers, and then these last five were for 5,000 and 7,500, depending on the particular tribe and what they agreed to, at tax rates that range from 15 to 25 percent of the gross gaming revenue for every single device, not just the new devices, but from device one to whatever they're paying. The money that the tribes have to pay to the state, that's only under the Schwarzenegger contracts. Is that right? No, no. In the 1999 compacts, there are two requirements of payments. There's payments that are into the Revenue Sharing Trust Fund, which the state administers and pays out to non-gaming or small tribes. And then there's payments. I didn't mean that. I meant the money the state could use for whatever it wanted. Well, there's a second fund in the 1999 compacts called the Special Distribution Fund. And for purposes, the short-term uses, the grandfather devices, for tribes that had been operating devices prior to 1999, they pay a percentage on those devices into the state distribution fund. There, the state legislature can determine how that money is dispersed. But as this court did in the in-rate gaming-related cases, the Coyote Valley cases, said that those funds, although the legislature has discretion on how they're used, they must be used to offset or pay for something that is directly related to the gaming activities that exist. As opposed to the new Schwarzenegger compacts, which with the exception of what Mr. Foreman talked about in terms of filling the shortfall, allows the state legislature to use that money for whatever means it wants without regard to- What we've got here is a change in philosophy. The Gray administration, or the Davis administration, the deal is much smaller numbers of machines. The payments go to be shared among the tribes without machines. And for gaming purposes, the Schwarzenegger administration, pretty much unlimited or much higher numbers of machines, but a 25% tax. Well, and that's not an issue that's in front of the court today, but we believe that that fundamental sea change in philosophy went from the legal realm of what's doable under the Indian Gaming Regulatory Act to the illegal realm, because Congress said you shall not use the compact negotiation process to impose a tax upon a tribe. And we believe that's exactly what the Schwarzenegger administration is doing with his new philosophy on compacts. Thank you, counsel. Thank you. I'd like to reserve- I did go over time. You went over- we'll give you a minute anyway. Good afternoon. At this point, Peter Coffman, Deputy Attorney General for Governor Arnold Schwarzenegger in the state of California. Are you dividing your time? Yes, and I would like to give Mr. Heathstand five minutes of my time. Would the court please make it 15 and five? Thank you, Your Honor. I think what I should emphasize, again, is that every argument, and this is in our briefs, but every argument that Marincon has raised and the arguments that were raised previously, have an answer in previous decisions of this circuit. On the question of the balance between an absent tribe's right to asserted sovereign immunity and not to be joined in litigation affecting its interests, this circuit has found eight times, and each time it's getting progressively stronger. The last decision, Wilbur v. Clark, said they afforded no weight to the absence of an alternative forum. In this case, there is an alternative forum, and it's not that, as counsel suggests, this is a Cabazon v. Wilson situation in which the state is arguing that it gets to make decisions about the compact and completely immune from judicial review. Marincon is litigating breach of compact claims against the state in the district court at this very moment. It is arguing that the state has breached the compact by not negotiating an amendment in good faith. It is arguing the state failed to meet the meet and confer requirements of the compact. It's arguing the state has failed to comply with the environmental provisions of the compact. And the state has not raised Rule 19 with respect to any of those claims. So it's not true that the state or that the way the state is interpreting the compact would leave a tribe with no ability to litigate breaches of compact in a judicial forum. The state is a licensing, I guess, there. Right, and it's because of the relationship of licensing to the interests, the protectable interests of all the other tribes who have that provision in their compact. Because as Justice Canvey pointed out, there is only one number. All tribes are bound by that single number. That's what makes this case a fixed fund case like McComb. Okay, but why can't that decision be made? And if there's a difference between a number that comes out of the Central District of California and one that comes out of the Eastern District of California, the number would be decided by this court. And that gives you then a single number. Tribes, if they wish to, may either sign up as interveners or they may come in as amicus. But they can be fully and fairly heard on that question. Well, I have two answers to that question. The first is that that would make the inconsistent obligation requirement for necessary parties meaningless because that should always be the case in federal court. Because I think what this is designed to do is to prevent multiple litigation. Yeah, but that is not the case in a case such as Provident Tradesman, which is the principal case interpreting Rule 19, where you have an insurance fund and there's the possibility of suing in state court where you cannot get the state judgment and the federal judgment to a single court. Well, we can envision a situation contrary to what counsel suggested. There could be an action brought in state court challenging a decision by the commission to issue an incorrect number of licenses. And I would guarantee you that they would probably be coming into that action and arguing that their indispensable parties in the case should be dismissed. So I think there is a possibility. The compact provides for a suit in state court where federal court lacks jurisdiction. I can envision arguments in state court as well. I think the point is that we're trying to – what RENCON is arguing is that the provisions in its compact that state that other tribes are immune from suits between RENCON and the state is inconvenient for them because it's not allowing them to get a decision. And so they're arguing that against the compact that they signed. There's a provision in the compact that specifically provides that the tribes are immune from suits in which they're not parties. They may be taking the position that, okay, we don't bring in those tribes. We just litigate the question between the state and us. Right, okay. But the compacts recognize tribal sovereign immunity, so now the question becomes we know they're immune. We know our compact specifically provides for immunity and says tribes can make the decision they don't want to join in a dispute over the compact. The question, again, then becomes whether there is a protectable interest. And, again, what's the protectable interest in not having a greater number than the state currently uses? Again, we have a draw process based on number of licenses. Tribes that are likely to have a higher priority could agree to a lower number. Tribes with the most devices... What's their interest in doing that? Well, their interest is in being able... Well, their interest is in the number itself, the aggregate number. The argument they would make would be different than the argument that RENCON would make because they have an interest in the number. The number that they have an interest in is likely to be different or can be different than the number that RENCON would propose for various reasons. What interest do they have in wanting a lower number than RENCON wants? Well, because they only need that number. They don't want to risk. They may have a better argument for the lower number. If they're getting what they need, then what interest are they protecting? Well, they are protecting against the other consequence, which is any time you enter into litigation, you can't predict the outcome. The court gets a question in front of it as to what is the aggregate number, and the court will make a determination about what it thinks the aggregate number is. I'm lost in what you're saying. If I go to the grocery store and I need three tomatoes, it doesn't matter to me whether there are 20 tomatoes in the bin or 100 tomatoes in the bin or 150 tomatoes in the bin. On the other hand, if I run a taxicab company and there are only 50 medallions for Fairbanks, then it matters to me a whole lot whether the number is 50 or 100 or 200. Now, it only matters to me in terms of how much money I make. My property interest in my 50 medallions is not impaired if somebody else gets 200. It's just that each of my medallions will be less profitable. If I understand Judge Canby's, the thrust of Judge Canby's questions to you, since there's no protectable interest in making more money from the medallion, why isn't this like the tomatoes? I don't know if I understood it right. I just don't care. As long as the grocery store has enough tomatoes for me, it just doesn't matter to me whether there are a lot more tomatoes or a whole lot more. Well, again, what I'm saying is they all have an interest in the number. Yeah, but what interest? That's what matters. A legally protectable interest or just a financial interest? Well, this is what they bargain for. They bargain for a single number. Now, what that number is is set forth in the compact, but they all have an interest and a claim to that number. Their reasons for it differ, which goes to the question of whether Rincon or Colusa could adequately represent their interest in that number. It's the number that they have an interest in, and that's a bargain for interest, or it's an interest that arises out of their bargain for contract. And that is the definition of a protectable interest in American Greyhound and other cases. They bargain for a single number, and what that number is is what they have an interest in. There are only two ways it can go. It's either going to be lower or higher. I suppose it may be the same. Well, it can go lower. I guess they're arguing that no party is arguing for the $23,000, but that's not an outcome that any party to litigation can guarantee. It could go lower. The court could determine that I'm construing this agreement, and I agree with Judge Norris, who was one of the state's negotiators for the compact, who came up with the $23,000 license number. So I guess my point is that these tribes have an interest because the compact gives them an interest in a single aggregate number. And so we're really faced with... Right. Because that's what they bargain for. There are different kinds of numbers you bargain for. Say you're doing construction and you make a deal with a supplier. I'll buy all my supplies from you, and you have to maintain at least so many 2x4s and so many of this and so many of that, so you'll never be short when I call on you for supplies. There, if the supplier has a higher number, it's no problem. Except for the tribes that are interested in the existing number, and they have bargained for that existing number. That's an interest that arises out of their contract. The only interest I can think of is to have less competition from other tribes for people that want to put quarters in the slots. Is that the interest, and is that protectable? I'll let Mr. Houston speak to that. You can speak adequately to their motivation for it. My point is that it may or may not matter what their motivation is. No, it does matter. It matters to whether a change in the number is material or not. They bargain for... For example, with contracts, there can be deviations from the terms that are not material breaches, because even though the people bargained for one thing and got another, the difference isn't material. But there's value to them in having one number versus another. As you indicated, if they're first out of the box, they're able to go forward first with their casinos, and they know that their compact is more valuable because they're able to take the benefit of being able to go first. That's part of the value of their compact. And if you change the number, if you suddenly increase it, you decrease the value of their compact, and that's protectable interest under the cases. If this were just simply a zero-sum game, so that the tribes are coming in and saying, you owe us 500 licenses, and those 500 licenses are subject to the cap, I don't care where you get them. You're going to have to take them from another tribe, but they belong to us. Then I think you've got, it's pretty clear that you've got a protectable interest. I don't hear that that's what anybody's arguing. Nobody's arguing that the licenses have to be taken from some other tribe. They're arguing that the cap is wrong. So that the only interest that tribes that oppose this can have is, it's the cap company interest. We don't want the competition. We don't want other tribes having more licenses because we've got all the licenses that we want or that we can qualify for or that we think that we can handle with the space that we've got, and therefore it's not in our interest to have any more competition. That doesn't strike me as a Rule 19 interest. Well, if that's what you've bargained for, if you've bargained for the lower number recognizing what the situation is on the ground, you may have a very powerful interest, but it just either doesn't strike me as a legally protectable interest or at least one that can't be protected in other ways besides just describing you as both necessary and indispensable. You may have every reason to want to pay lots of lawyers a lot of money to come in and defend that number, but I don't know why that means that in your absence, the litigation cannot possibly proceed. Well, because it is litigating in your absence the number that you bargained for in your compact. What you're saying is circular. It has to be a legally protectable interest to make the party indispensable. If it's only an interest in compliance with a contract that could be in order to reduce competition, then that isn't a legally protectable interest. But if it's an interest in not having property taken away, it is. Well, let's... You're trying to steal our position. I don't want to steal Mr. Houston's thunder because that's what he's here to talk about, about their protectable interest. You can leave it for him if you want. Why the state can't. He's going to thank me for it, but I would... I feel a little... I mean, it's somewhat awkward. Look, just go for it. If co-counsel is going to do it, great. All right. And I do. I can't let that pass without responding to the notion that the Schwarzenegger compacts are imposing an unlawful tax. That obviously is not before the court. It is before the district court below. And it's interesting that the remedy that I've said is provided in the compact for tribes that want additional licenses is that their argument to the district court below is that the state is not entitled to require anything of them in return for the acquisition of additional licenses. Thank you, counsel. That's a question... So they're making the argument that they're entitled to... in the district court to get more licenses by filing a bad faith claim against the state on the grounds the state is not entitled to ask for anything more from the tribe than they... Look, you're over time, and we've got to stay alert for co-counsel's argument. Okay. Thank you. Thank you. Good afternoon, Your Honors. My name is Fred Heaston, appearing for five tribes as amici curiae in support of the position of the state on the one limited issue in this case of the determination of the number of licenses available... So your clients don't want the number to change? They don't want the number to go up? We do not want the number to change. Why? When the compacts were negotiated, including the tribes I represent as amici, it was understood that there would be, at some point in time, a fixed number of licenses set. Have your clients maxed out their licenses? Well, they could not get any more licenses. This was in 1999. By 2002, the California Gambling Control Commission had determined that aggregate pool size to be 32,000, I believe, 151 licenses. My tribes were in the position then of knowing the only way they could increase their number of gambling devices, the same as any other tribe, was to wait for a pool draw or to renegotiate their compacts. We renegotiated the compacts, paying what Mr. Crowell referred to as ridiculous fees to get additional machines, knowing that the aggregate size of the pool was then set at 32,151. Now, we also assumed a lot of obligations to the state in these renegotiated compacts that weren't in the earlier compacts, obligations with respect to environmental protections, obligations with respect to protections of workers, obligations with respect to protection of patrons that came on. Why do your clients have a legally protected interest in that number? Why haven't they just assumed the risk that there wouldn't be litigation challenging the number if the number wouldn't change? Your clients have paid a fee to the state to renegotiate the contract. We don't assume that there will not be litigation over any subject. So we had an interest in that number. We knew that it could possibly change. The commission itself could change it. What hurts your clients if the number is increased, except that some people may put quarters in other tribes' slots? Well, since we pay an increased, the way the new compacts were negotiated with, obviously the fixed number of the pool in size at the time in 2004, it hasn't been increased since 2002. If we want additional machines, depending on what category or level we want additional machines, like 500 or 1,000 machines, we pay a greater percentage. We also, as I said, have a lot of additional obligations to meet to the state, regardless of the number of additional machines we get. But if you were suddenly to increase the size of that pool, it means that tribes in our areas could get additional machines and not pay the amount of money that we're having to pay. Your folks are at a competitive disadvantage. And our ability to fulfill our obligations under the compact is impaired. You may have an argument for mutual mistake of fact, because this was an assumption when you went into that. But why do you have a legally protected interest? Well, I think the legally protected interest is in not, in the words of American Greyhound, would not have our compacts rendered less valuable to the tribes than they were at the time we entered into them. Our compacts would be completely devalued. Our ability to fulfill our obligations under them would be substantially impaired. You know, I don't know what relief we could get for that. The pool expanded. I thought what you had to pay was a percentage. No, we have a percentage on different levels. So on a sliding scale of increased fees per machine at specified numerical thresholds, going up to, you know, 15, 25 percent of the net win. I was thinking if other tribes got more machines, you didn't get any less machines. So you make less revenue. You also pay less to the state. Is that right? Well, it may be that if other tribes get machines, it would make the addition of the gaming devices that we have completely uneconomical, that what we have to pay in license fees for those additional machines can equal or exceed the return we get on the additional machines. So we're in a loss position then. I know this pool talk gets very confusing because there are two different kinds of pools. Well, it's very hard to interpret it as anything other than freedom from competition, and I don't know whether that's protectable. Well, it's not just freedom from competition. It's an impairment of our tribes' abilities to carry out the additional obligations in the amended compacts. See, all the tribes are asking for is a construction of what their compacts promised them. And they say that the number is being improperly calculated. And that's uncertain and maybe subject to litigation, and somebody will have to settle it. But that's what we all bargain for is an accurate number of the total license cap. And when you negotiated your compacts, recent ones, you knew what the language was in the standard 60-some compacts. Right. And we knew what the number was because that had been in existence for more than two years at that time as to what the pool was. And you knew that some people were claiming that wasn't the right number. And we knew we could either do as RINCON does, trying to get that number up and wait in line for the pool and not have to pay as much money, or we could renegotiate compacts, which was what the state of California had taken the position as if any tribes want compacts beyond what they can get under their original terms. They've got to sit down at the table and renegotiate. Well, you made a business decision on the best information you had, but I don't know whether you were assuming the risk that some litigation would determine that the 60-some compacts had a different number. Even the language of the compacts didn't change. It was just a construction of the compact. Yes, the language of the compact did not change. It was my interpretation as to what that size of the license pool was that had been in existence for a couple of years. We could have continued to litigate it, or we could have entered into negotiations to amend our compact under new terms. RINCON doesn't want to pay what they consider ridiculous fees to get additional machines. They would like to just get the pool size expanded. They have one number in mind. Toulouse has another number in mind. There's a third case before you that has a third number in mind. Any one of those numbers can have different impacts upon the amici tribes that appear here before you today. Because you take the example, three of our tribes are in the San Diego area where RINCON is. I don't know how many. And a lot of gaming tribes in California are in the RINCON area. Counsel, you're way over. Okay. So I'll just end by saying I don't know if I've helped anything on this, but we don't believe that the state adequately can represent our interests as amicus here. And we believe that many decisions of this court have made clear as to why. They have no fiduciary responsibility to us. And we've been in disputes with them in a number of cases before this court. Thank you, Counsel. Thank you, Your Honor. You went over time, but we gave you one minute. And I appreciate it. I know it's been a long day for you. To give a specific answer to the earlier question about ratified amended compacts with the Schwarzenegger administration, there are a total of 13 of them. Seven of them have no limits on the number of machines at all. That includes the amici, by the way, which includes the Paula and Palma tribe, which are RINCON's nearest competitors. And the suggestion that they can put in thousands of machines and are going to be seriously impaired by RINCON getting the 400 machines it believes it's entitled to out of the statewide pool is pure speculation on its part. And as the Ninth Circuit has said, when it looks to the indispensability analysis, it looks to the practical reality of the litigation in front of it. Seven of those compacts have no limits at all. Three of those compacts have limits of 77,500 machines, and two of those compacts have limits of 5,000 machines. And I know the tax issue is not in front of us, but I have to correct Mr. Kaufman. RINCON's offer to the state is to pay whatever the cost directly related to the mitigation of direct impacts or regulatory costs are, whether they may be higher than what the state currently is incurring or not. What we're not willing to do is pay money into the general fund for the state to use as its discretion because we believe that that's an illegal tax that violates the principles set out by Congress in IGRA and expressly stated so. Thank you, counsel. Thank you very much. RINCON v. Schwarzenegger is submitted to return until 9 a.m. tomorrow morning.
judges: Canby, Kleinfeld, Bybee